**Philip BRIGGS, Plaintiff–Appellant,**

v.

**AMERICAN AIR FILTER CO., INC., and William F. McClure, Jr., Defendants–Appellees.**

**Dan C. ROBY, Plaintiff–Appellant,**

v.

**AMERICAN AIR FILTER CO., INC., and William F. McClure, Jr., Defendants–Appellees.**

No. 78–2739.

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1980.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

We must today interpret the "extension telephone exception" to the prohibition against wiretapping and electronic surveillance contained in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 ("Title III"). In particular, we must decide whether defendant–appellee William F. McClure, Jr., used a telephone "in the ordinary course of ... business" when he used it to listen to a conversation between plaintiffs–appellants Philip Briggs and Dan C. Roby.

We might wish we had planted a powerful electronic bug in a Congressional antechamber to garner every clue concerning Title III, for we are once again faced with the troublesome task of an interstitial interpretation of an amorphous Congressional enactment. Even a clear bright beam of statutory language can be obscured by the mirror of Congressional intent. Here, we must divine the will of Congress when all recorded signs point to less than full reflection. But, alas, we lack any sophisticated sensor of Congressional whispers, and are remitted to our more primitive tools. With them, we can only hope to measure Congress' general clime. So we engage our wind vane and barometer and seek to measure the direction of the Congressional vapors and the pressures fomenting them. Our search for lightning bolts of comprehension traverses a fog of inclusions and exclusions which obscures both the parties' burdens and the ultimate goal.

Many of the facts of this case are undisputed. Defendant–Appellee American Air Filter Co., Inc., is a Delaware corporation engaged in the manufacture and sale of heating, ventilating, air conditioning, and air filtering equipment. Roby was a salesman for Air Filter. McClure, manager of Air Filter's Atlanta office, was his supervisor. Briggs was a former employee of Air

Donald A. Weissman, Robert C. Dillon, Atlanta, Ga., for plaintiff–appellant.

Greene Buckley, DeRieux & Jones, Burt DeRieux, Eileen Crowley, Atlanta, Ga., for American Air Filter Co., Inc. and for William F. McClure, Jr.

Filter and a friend of Roby. Briggs was operating a business which competed with Air Filter by selling similar equipment. Another ex–employee of Air Filter named Phil Chapman was also in competition with Air Filter and a friend of Briggs.

Briggs and Roby were friends who talked to each other and met one another with some frequency prior to the phone conversation at issue here. McClure was unhappy about their contacts because he suspected that Roby was disclosing confidential information about jobs for which Air Filter and Briggs were in competition and that Briggs was disparaging Air Filter. McClure and Roby had several discussions about Roby's friendship with Briggs and Chapman, at which McClure attempted to dissuade Roby from contacts with Briggs and Chapman, and at which Roby stated that he generally did not discuss business with Briggs and Chapman. During one such meeting, McClure admonished Roby not to discuss Air Filter business with Briggs.

McClure claims that he was advised by one of Air Filter's customers that Roby was working with Briggs and Chapman in their business. McClure then undertook to determine the nature of the connection between Roby, Briggs, and Chapman. McClure claims that he was told that Chapman and Roby had been discussing a job which was to be bid upon the following day. The next day, McClure and Roby discussed another job on which Air Filter intended to bid. About thirty minutes later, he was informed by a secretary that Roby was talking to Briggs.

Roby was in a private office where he could not be overheard, as was Briggs. According to an affidavit submitted by Roby and Briggs, the call was "related to and intended to be in furtherance of [Air Filter's] business. [It] was not a personal call." Roby Record at 51, Briggs Record at 34. Neither Roby nor Briggs had been informed that their calls might be monitored and neither had consented to being monitored.

McClure picked up his phone receiver, which was an ordinary extension telephone. He listened to and recorded part of the conversation between Briggs and Roby. The conversation related to Air Filter business. McClure claims the conversation concerned projects on which Air Filter intended to bid. Briggs does not dispute this, but asserts that nothing of a confidential nature was discussed. The recording was done with an attachment to a portable dictating machine. The attachment was a standard piece of equipment which had been provided when the dictating machine was purchased.

■ The complaint, originally filed in state court, alleged that the listening–in violated federal and state law. The defendants removed the case to federal court. After discovery and the submission of affidavits, the district court, 455 F.Supp. 179, granted summary judgment for defendants on the federal claim and remanded the state claims to state court. Plaintiffs appealed.[1]

18 U.S.C. § 2520[2] provides a civil cause of action and statutory damages[3] to individuals whose wire or oral communications are intercepted. Many of the terms used in section 2520 are defined in 18 U.S.C. § 2510.

---

1. The entry of summary judgment on the federal claims is appealable despite the remand of other claims to state court. *See City of Waco v. United States Fidelity & Guarantee Co.*, 293 U.S. 140, 55 S.Ct. 6, 79 L.Ed. 244 (1934); *Southeast Mortgage Co. v. Mullins*, 514 F.2d 747 (5th Cir. 1975).

2. In relevant part, 18 U.S.C. § 2520 provides:
   Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person–
   (a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
   (b) punitive damages; and
   (c) a reasonable attorney's fee and other litigation costs reasonably incurred.

3. There are also criminal penalties provided by 18 U.S.C. § 2511.

"Wire communication" means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications." 18 U.S.C. § 2510(1). A telephone conversation is a wire communication. *See United States v. Axselle*, 604 F.2d 1330, 1334 (10th Cir. 1979); *United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974).[4] "Intercept" means "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4). "Electronic, mechanical or other device" means "any device or apparatus which can be used to intercept a wire or oral communication other than—

(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business; or (ii) being used by a communications common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

(b) a hearing aid or similar device being used to correct subnormal hearing to not better than normal."

18 U.S.C. § 2510(5).

Under these definitions, the question in dispute in this case can be stated simply: was the telephone used by McClure to listen to the conversation between Briggs and Roby "being used by the subscriber or user in the ordinary course of its business." If

so, the telephone was not a "device,"[5] the act of listening–in did not satisfy the statutory definition of an interception, and the dismissal below must be affirmed. If not, the telephone was a "device" used to intercept a wire communication, and the act of listening–in was proscribed by Title III.

Before discussing Title III directly, we pause to clarify the relationship between employees' "expectations of privacy" in their offices and the statutory structure. As we have noted, *see* n. 4 *supra*, interception (as defined by the statute) of wire communications is forbidden regardless of the speaker's expectation of privacy. The contention that an act of listening–in is not "in the ordinary course of business" *because* the speaker had a reasonable expectation of privacy puts the cart before the horse. Since "a person's *general* right to privacy ... is ... left largely to the law of the individual States," *Katz v. United States*, 389 U.S. 347, 350–51, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (emphasis in original, footnotes omitted), a person has an expectation of privacy enforceable under federal law against private individuals only if federal law prohibits the interception. The question before us is thus whether the act of listening–in was "in the ordinary course of business." If not, persons in situations similar to that of appellants have a reasonable expectation that private individuals will not violate federal law by listening–in to their calls. If so, any subjective belief by persons in situations similar to that of appellants that *federal law* protects their conversations against interception by private individuals would be unreasonable.[6] In such a case, any expectation of privacy, and any judicial relief, must derive from state law. By noting that the "ordinary course of business" determination is logically prior to the conclusion that federal law creates an en-

---

4. Wire communications, unlike oral communications, are protected against interception by electronic, mechanical, and other devices regardless of the speaker's expectation of privacy. *Compare* 18 U.S.C. § 2510(1) *with* 18 U.S.C. § 2510(2).

5. It is not disputed that the telephone was "furnished to the subscriber as user by a communications common carrier in the ordinary course of its business." 18 U.S.C. § 2510(5)(a).

6. Appellants have suggested no federal basis for their expectation of privacy other than Title III.

forceable expectation of privacy, we by no means intend to suggest that the same common experience and behavior which help define our expectations are irrelevant to the "ordinary course of business" issue. If the common experience in this country is that under certain circumstances, communications made on office telephones are not listened to by employers or their agents, it could not be said that an act of listening—in to such a conversation is "in the *ordinary* course of business."

We now turn to Title III itself to attempt to divine the meaning of the phrase "ordinary course of business." Unfortunately, the lengthy legislative history of Title III, *see generally Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974), sheds almost no light on what Congress intended by the extension telephone exception. The major focus of the legislation was on use of wiretapping and electronic surveillance by law enforcement officials to combat organized crime. *See* S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News, pp. 2112, 2153–56. The act was passed to "clarify the confusion" in the state of the law governing surveillance and wiretaps by law enforcement officials. *See id.* at 2154. The prohibition on private wiretapping and surveillance appears to be an almost incidental extension, added because "virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification when communications are intercepted without the consent of one of the participants." *Id.* at 2156.

In the early draft of the bill, the extension phone exception took the following form:

> The term "electronic, mechanical, or other device" does not include—
>
> (1) an extension telephone instrument furnished to the subscriber or user by a communications common carrier in the ordinary course of its business . . . .

H.R. 5470, 90th Cong., 1st Sess., § 2515(d)(1) (1967), *reprinted in* Hearings on the Anti–Crime Program Before the Subcomm. No. 5 of House Comm. on the Judiciary, 90th Cong., 1st Sess. 892, 894 (1967) [hereinafter cited as *Hearings* ]. This blanket exclusion of "normal" extension telephones is not surprising—the ordinary extension telephone was not the type of specialized wiretapping or electronic surveillance equipment Congress had in mind when it was contemplating banning use of "devices." However, some individuals perceived that in certain circumstances an ordinary extension telephone could be used to "spy" on private conversations by either law enforcement officials or private citizens. Professor Herman Schwartz, appearing for the American Civil Liberties Union, voicing this concern before a House subcommittee, listed the following types of uses of extension telephones which he felt should be outlawed as unwarranted invasions on privacy:

> 1) an eavesdropper breaks in, hides in one part of a house or office without the knowledge of anyone else, and listens in on an extension,
>
> 2) the police or someone else coerce someone into letting them listen in on an extension phone,
>
> 3) the police or someone else obtain authority to listen in on an extension phone by someone not a party to the conversation and who has no authority of any kind to allow them to do so.

*Hearings* at 989, 1015.

When the bill was passed, the blanket exception for extension phones provided by communications common carriers in the ordinary course of their business was limited to such phones when they were being used in the ordinary course of the subscriber's or user's business. *See* 18 U.S.C. § 2510(4) (reprinted at p. 417, *supra*). There appears to be no indication of what Congress intended by this limitation other than whatever can be inferred from the fact that it seems somewhat responsive to Professor Schwartz's comments. In fact, the Senate Report on the bill as enacted, in listing exceptions to the absolute ban on wiretapping and electronic surveillance, completely neglects the extension phone exception. *See* S.Rep. No. 1097, *supra*, [1968] U.S.Code Cong. & Ad.News, pp. 2153–54.

There are a few reported cases concerning electronic surveillance in connection with domestic disputes. *See, e. g., United States v. Rizzo*, 583 F.2d 907 (7th Cir. 1978); *Anonymous v. Anonymous*, 558 F.2d 677 (2d Cir. 1977); *United States v. Jones*, 542 F.2d 661 (6th Cir. 1976); *White v. Weiss*, 535 F.2d 1067 (8th Cir. 1976); *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974). They are of little help to use here, because none sheds any perceptible light on what Congress meant by "use in the ordinary course of . . . business."[7] We also do not find helpful cases dealing with other exceptions, such as those which involve the right of a communications common carrier to determine if its equipment is being used. *See, e. g., United States v. Clegg*, 509 F.2d 605 (5th Cir. 1975).

With no firm guidance from the legislative history or these cases, we turn to the only relevant judicial interpretation of the "ordinary course of business" exception. In *United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974), the Tenth Circuit held "as a matter of law that a telephone extension used without authorization or consent to surreptitiously record a private telephone conversation is not used in the ordinary course of business," *id.* at 351, and affirmed Harpel's conviction under 18 U.S.C. § 2511 for disclosing an unlawfully intercepted communication. The intercepted phone call was between agents in two different law enforcement offices. None of the parties to the conversation authorized anyone to listen to or record it. There were numerous extension phones in the offices at each end of the conversation. *See id.* at 348. It is not apparent from the opinion whether the phone call was intercepted by someone who had authority both to be in one of the offices from which the call was made and to

use the phones in that office, or by someone who had no authorization to be in the office or to use the phones. Therefore, when the court stated that the interception was done without authorization or consent, it is not clear whether it meant "authorization by one of the parties to listen to the particular phone call" or "general authorization to have access to the phones in the office." Given the court's earlier discussion of the lack of consent by any party to the phone call, *see id.* at 348, we suspect it had in mind the former meaning.

If "authorization" is so interpreted, we cannot agree with the court's conclusion. To hold that a business extension telephone is a "device" unless it is used with the consent of one of the parties to the conversation would be to read the extension telephone exception out of the law, because 18 U.S.C. § 2511(2)(d) makes clear that interception is generally not unlawful if one of the parties to the communication has authorized the interception. Thus, under this interpretation, the business extension exception would be completely superfluous. We do not believe Congress intended the exception to be superfluous, and therefore there must be some circumstances under which non–consensual interception falls within the "ordinary course of business" exception.

We can agree with the Tenth Circuit to the extent that it held that use of an extension telephone to intercept a phone call by someone who was not authorized to use the phone under any circumstances cannot be used "in the ordinary course of business." This does not help us answer the question before us today, however, because McClure's general authority to use Air Filter telephones is not questioned here.

---

**7.** *Simpson, supra*, implies *in dictum* that an extension phone in the family home is a phone "being used in the ordinary course of . . . business." *See id.*, 490 F.2d at 809. However, the holding of that case was carefully limited to its facts at the time, *see id.* at 810, and has been so limited by other courts. *See, e. g., Jones, supra*, 542 F.2d at 672. *Anonymous, supra*, relies on this exception in the context of a listening–in on an extension phone in a private home, *see*

*id.*, 558 F.2d at 678–79, but, like *Simpson*, assumes the conclusion that the exception includes use of an extension phone to overhear conversations of family members. Since the use of extension phones to listen to conversations of family members is quite different from their use in the business context, we do not find these broad statements helpful in answering the question before us.

■ Once the conclusion that a listening-in authorized by neither of the parties to the communication can never be "in the ordinary course of business" is rejected, the proper resolution of this case becomes relatively easy. If Congress intended to authorize any type of interception not consented to by a party to the communication, as we conclude it did, this is it. First, the plaintiffs themselves submitted an affidavit stating that this was a business, not a personal, call. See p. 416 *supra.* Thus, we need not, and do not, reach the question whether interception of a personal call on a business extension telephone is authorized by section 2510(5)(a).[8] Second, McClure's act of listening-in was limited in purpose and time. McClure had specific suspicions about the conversation, and listened only long enough to confirm that Roby and Briggs were discussing business matters. Therefore, we do not decide at what point continued listening-in by McClure would have violated Title III had Briggs and Roby turned to a discussion of personal matters. Third, the act of listening-in was not part of a general practice of surreptitious monitoring.[9] We thus also do not decide whether a general practice of random monitoring of employee calls can ever be justified under the subsection.[10] We decide only that when an employee's supervisor has particular suspicions about confidential information being disclosed to a business competitor, has warned the employee not to disclose such information, has reason to believe that the employee is continuing to disclose the information, and knows that a particular phone call is with an agent of the competitor, it is within the ordinary course of business to listen in on an extension phone for at least so long as the call involves the type of information he fears is being disclosed.

By so ruling we do not condone appellees' conduct. We merely find that Congress did not intend to prohibit this particular type of conduct when it enacted Title III. The listening-in engaged in by McClure may be unlawful under state law, and of course a company could forbid its employees from ever listening-in to the conversations of other employees.[11]

Appellants also contend that the grant of summary judgment was improper because the question whether the interception was reasonable and appropriate should have been submitted to the jury. We agree that the "ordinary course of business" exception does not encompass interceptions not reasonably related to a business purpose. However, appellants have submitted no affidavits controverting any of the material facts which compel the conclusion that McClure's act of listening-in was "in the ordinary course of business" if the extension telephone exclusion enacted by Congress has any substance at all. On the uncontroverted facts of this case, we hold as a matter of law, that McClure's limited use of an extension telephone fell within the statutory exclusion.

8. In general, it is hard to see how use of an extension telephone to intercept a call involving non-business matters could be "in the ordinary course of business," since such activity is unlikely to further any legitimate business interest. However, interception of calls reasonably suspected to involve non-business matters might be justifiable by an employer who had had difficulty controlling personal use of business equipment through warnings.

9. A general practice of surreptitious monitoring would be more intrusive on employees' privacy than monitoring limited to specific occasions. Since the specific justification advanced here is so closely tied to a legitimate business purpose, we have no hesitation holding that there is nothing extraordinary about McClure's act of listening in. Were the business justification less compelling, the absence of any company policy or prior warnings concerning use of company telephones might be more significant.

10. In *James v. Newspaper Agency Corp.*, 591 F.2d 579 (10th Cir. 1979), the Tenth Circuit held that the monitoring of employee phone calls by supervisory personnel fell within the extension telephone exception. The monitoring device had been installed by the Bell system and all affected personnel had been notified in writing about the monitoring device.

11. We express no opinion on how a company policy against listening-in would affect whether an act of listening-in could be "in the ordinary course of business." No such policy existed at Air Filter.

For these reasons, the decision of the district court granting summary judgment to the defendants is AFFIRMED.

THOMAS A. CLARK, Circuit Judge, specially concurring:

Interpretation of the Statute is difficult as pointed out in the majority opinion. Congress intended to make unlawful the invasion of telephone conversations by wire tapping. While considering the legislation, it was pointed out that such an invasion could be accomplished by listening–in on an extension telephone. A telephone is an "electronic, mechanical, or other device" that can be used to intercept a wire communication, except when the use of the telephone is "by the subscriber or user in the ordinary course of its business".[1] Such use then becomes lawful. Any other use of the telephone [except by a communications common carrier or law enforcement officer as described in the Act] is illegal when used to intercept a wire communication.

Here the plaintiffs themselves said the telephone conversation was a "business" one, thus making it a telephone used in the ordinary course of business, and thus authorizing a co–employee to listen–in without breaking the law. That ends their case and our inquiry of their case.

Where I differ from the majority is in not making the suggestion in Footnote 8 a part of our holding. In the footnote it is suggested that the interception of a non–business call is probably not "in the ordinary cause of business". I would make that a positive, affirmative statement because I think the distinction is reasonably clear as to what can and cannot be intercepted: a business call can be, a private call cannot be. *Harpel*[2] held that a private call could not be intercepted and I agree with that holding.

---

1. 18 U.S.C. § 2510(5)(*o*).

2. *U. S. v. Harpel*, 493 F.2d 346 (10th Cir. 1974).