Jodie S. ABBOTT, et al., Plaintiffs,

v.

The VILLAGE OF WINTHROP HARBOR, et al., Defendants.

No. 93 C 4642.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 13, 1996.

James Thomas Harrison, Harrison Law Offices, P.C., Woodstock, IL, Kenneth Leo Cunniff, Chicago, IL, for plaintiffs.

Byron Doyle Knight, Elizabeth Ann Knight, Kathryn M. Keegan, Knight, Hoppe, Fanning & Knight, Ltd., Des Plaines, IL, for Village of Winthrop Harbor, defendant.

Jack J. Carriglio, Douglas Robert Stevens, Paul Adam Henmueller, Foran & Schultz, Chicago, IL, Elizabeth Ann Knight, Kathryn M. Keegan, Knight, Hoppe, Fanning & Knight, Ltd., Des Plaines, IL, for Kenneth B. Miller, defendant.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Defendant Kenneth B. Miller, individually and in his official capacity as Chief of Police for the Winthrop Harbor Police Department, has filed a motion for summary judgment on counts 9, 11, 13, 15, and 18 [1] of the Plaintiffs' Complaint. The Complaint arises out of the alleged placement of a recording device on a "private" telephone line at the Winthrop Harbor Police Department. Judge Marovich previously dismissed counts 2, 4, 6, 8, 10, 12, 14, and 16 by granting a motion made by the Defendants to deny class certification.[2] This court subsequently dismissed count 7 based on the arguments made in the first motion to dismiss.[3]

### Background

The Village of Winthrop Harbor maintains the Winthrop Harbor Police Department (the "Police Department" or the "Department") and employed defendant Kenneth Miller ("Miller") as Chief of Police at all times relevant herein. The Plaintiffs are either current or former employees of the Winthrop Harbor Police Department, or non-employees who engaged in at least one conversation over a certain telephone line. (Complaint ¶ 7).

At all times relevant herein, the Police Department maintained a telephone system for communications to and from the Department. (*Id.* at ¶ 3). Several of the Police Department's phone lines were used in the ordinary course of the Department's business, and were at various times recorded by an electronic or mechanical device. The Court will refer to these lines as the "Tapped Lines."

Before September 27, 1991, the Department maintained one untapped phone line for

---

1. In his motion for summary judgment and supporting memoranda, Miller prays for summary judgment on counts 9, 11, 13, 15, and 17 of the Plaintiffs' complaint. Count 17, however, alleges violations of the Omnibus Crime Control and Safe Streets Act (Title III) against the Village of Winthrop Harbor. Defendant Miller is not named in count 17. Rather, the Plaintiffs allege violations of Title III against Miller in count 18. Accordingly, the Court interprets Miller's motion

for summary judgment as requesting summary judgment on counts 9, 11, 13, 15, and 18.

2. *Abbott et al. v. Village of Winthrop Harbor, et al.*, No. 93 C 4642, 1994 WL 66127 (N.D.Ill. 1994).

3. *Abbott et al. v. Village of Winthrop Harbor, et al.*, No. 93 C 4642, 1995 WL 51553 (N.D.Ill. 1995).

private, personal calls (the "Private Line" or "3868"). (*Id.* at ¶ 5). The Private Line was used by the Police Department employees when conducting confidential conversations unrelated to Department affairs. At all times relevant to this case, it was the announced policy of the Department to have all business calls made on a Tapped Line, and all personal calls made on the Private Line. (Defendants Village of Winthrop Harbor and Kenneth Miller's Joint 12(M) Statement of Material Facts ("12(M)") ¶¶ 4, 6 & Ex. A). In recognition of such policy, Miller issued a memorandum on behalf of the Winthrop Harbor Police Department on September 27, 1991 which stated in relevant part:

> 1. 9–1–1 is now on line, all phones except 746–3868 are being recorded and all radios are being recorded. When placing a phone call that is police related it will be done on a recorded line.

(*Id.*). The memorandum was written on Winthrop Harbor Police Department stationery, signed by Miller, and addressed to "All Police Personnel" regarding "Information." (Complaint ¶ 5).

On or about August 1992, defendant Kenneth Miller caused a recording device that surreptitiously recorded all communications made on 3868 to be installed. (12(M) ¶ 10). Every thirty days the recorded 3638 communications were erased. (12(M) ¶ 29). The device remained installed and the recording of private communications continued until approximately May 1993. (Complaint ¶ 10). From August 1992 to May 1993, the Plaintiffs had one or more conversations transmitted on the 3868 with each other or with third parties. (Plaintiffs' Rule 12(N) Statement in Response to Motions for Summary Judgment by the Village of Harbor and Kenneth Miller ("12(N)") ¶ 4). Plaintiffs believed that their conversations were not recorded. (*Id.* ¶ 8). Also during that time, arrestees held at the Police Department were instructed to use the Private Line to make their personal phone calls. (12(N) ¶ 6).

At or around the time that Miller caused the recording device to be installed, he contacted the village attorney, Perry Smith, to discuss whether he, Miller, was required to install an additional device which would emit a beep so as to inform the users of 3868 that their communications were being recorded. (12(M) ¶¶ 1, 11; Deposition of Kenneth B. Miller ("Miller Depo.") p. 65). According to Miller, Smith responded that anyone calling the police department should assume that the calls were being taped. (12(M) ¶ 16). Smith denies this allegation and maintains that he informed Miller that Miller was required by law to give the users of 3868 notice of the recording and to install a beep tone. (12(N) ¶ 20; Smith Depo. p. 20). Neither Miller nor anyone else[4] informed the Plaintiffs that, as of August 1992, their calls on the Private Line were being recorded or of a change of policy regarding the Private Line. (12(M) ¶ 15; *Id.* ¶ 11). Indeed, the Plaintiffs were informed and believed that their calls placed on 3868 were private, unmonitored communications. (12(N) ¶¶ 1, 31; *Id.* ¶ 8). The parties dispute whether there was a beep tone on 3868. (*See* 12(M) ¶¶ 20–27; 12(N) ¶ 3).

In addition, during the months of August 1992 to May 1993, Miller instructed Georgene Ortiz ("Ortiz"), Supervisor of Communications for the Department, to listen to and copy the communications of plaintiff Jodie Abbott ("Abbott") and other plaintiffs who made phone calls on 3868. (*Id.* ¶ 12). The Plaintiffs allege that Miller also listened to various recorded communications made on 3868 by plaintiff Abbott and other plaintiffs. (*Id.* ¶ 14).

In November or December of 1992, James Greene, a plaintiff and employee in the Police Department, observed Howard Thomas, an employee at the Department, wearing earphones and Ortiz transcribing Abbott's recorded communication. (12(N) ¶ 27). Ortiz admits to transcribing private communica-

---

4. Miller claims that officer Ricardo Concepcion, a field training officer, instructed officers at the department that 3868 was recorded. (12(M) ¶ 19; Deposition of Ricardo Concepcion p. 49). However, Miller fails to establish that any of the Plaintiffs in this case were instructed by Concep-cion or anyone else that line 3868 would no longer be maintained as a private, unrecorded line. Thus, when viewed in the light most favorable to the Plaintiffs, such evidence becomes irrelevant to the case at bar.

tions made by Abbott on 3868. (12(N) ¶ 28, 29). In January 1993, Greene began to suspect that Miller was recording and listening to Greene's private communications on 3868 because Miller allegedly exhibited personal knowledge of private communications. to which Miller was not a known party. (12(N) ¶ 25).

The Plaintiffs allege that the defendant Miller's surreptitious recording of their conversations violated the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2511(1)(a) ("Title III"), the Fourth and Fourteenth Amendments under Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983"), the Illinois Eavesdropping Act, and the Illinois common law right to privacy. Miller moves for summary judgment on counts 9, 11, 13, 15, and 18 on grounds of immunity and the Plaintiffs' alleged failure to prove an essential element of their claim.

### Legal Standard for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir.1995); *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir.1986). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The primary inquiry is whether the evidence presents a sufficient disagreement to require a trial, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). If the moving party meets this burden, the nonmoving party must then respond by setting forth specific facts which demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e);

*Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *see Curtis v. Bembenek*, 48 F.3d 281 (7th Cir.1995). All reasonable inferences from the record are to be drawn in favor of the nonmoving party. *Johnson v. Runyon et al.*, 47 F.3d 911 (7th Cir.1995); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994).

### Discussion

### I. Qualified Immunity: Counts 9, 11, & 18

Defendant Miller asserts the affirmative defense of qualified immunity against each and every named plaintiff as to count 9, which alleges violations of Title III, and count 11, which alleges violations of the Fourth and Fourteenth amendments under § 1983. In addition, Miller maintains that he is entitled to qualified immunity against plaintiff Abbott, individually, on count 18, which also alleges violations of Title III.

The doctrine of qualified immunity, when applicable, provides government officials performing discretionary functions protection from liability as well as protection from suit for civil damages. *Behrens v. Pelletier*, —— U.S. ——, ——, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996) (quoting *Harlow*, at 818, 102 S.Ct. at 2738); *see also Erwin v. Daley*, 92 F.3d 521, 523 (7th Cir.1996). The defendant bears the burden of pleading the defense. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923–24, 64 L.Ed.2d 572 (1980). The Supreme Court has not explicitly resolved the question of which party bears the burden of proof in contrast to the burden of pleading. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 n. 24, 102 S.Ct. 2727, 2737 n. 24, 73 L.Ed.2d 396 (1982); *Gomez*, at 642, 100 S.Ct. at 1924 (Rehnquist, J. concurring). The Seventh Circuit, however, has repeatedly held that while public officials asserting the defense have the burden of pleading, the plaintiff bears the burden of demonstrating that the conduct at issue violated a right that was clearly established when the conduct occurred.[5] *See, e.g., Magdziak v. Byrd*, 96

---

**5.** The Plaintiffs argue that the defendant bears the burden of proof with respect to the defense of qualified immunity. (Plaintiffs' Memo. p. 2). In

support of their proposition, the Plaintiffs direct the Court's attention to a Second Circuit case, *In re State Police Litigation*, 88 F.3d 111 (2d Cir.

F.3d 1045, 1047 (7th Cir.1996); *Montville v. Lewis,* 87 F.3d 900, 902 (7th Cir.1996); *Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir.1996), *Rakovich v. Wade,* 850 F.2d 1180, 1209 (1987). With respect to the Plaintiffs' burden of proof, the Supreme Court set forth the following two-part analysis in *Harlow:* "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 525–26, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)); *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). The Court addresses these questions below. Thus, in order to prevail on his motion for summary judgment, Miller must prove that the Plaintiffs have failed to demonstrate that their constitutional rights were clearly established at the time of the alleged violation. As with all summary judgment motions, the evidence should be viewed in the light most favorable to the nonmoving party, in this case, the Plaintiffs. *Johnson v. Runyon et al.,* 47 F.3d 911 (7th Cir.1995); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994).

## A. *Constitutional Violation*

The Court interprets counts 9 and 11 of the Plaintiffs' complaint to make the following allegations of constitutional violation: (1) Miller violated the Plaintiffs' constitutional protection against invasion of privacy as safeguarded by Title III, by intentionally intercepting telephone communications made by the plaintiffs on 3868, and (2) Miller violated the Plaintiffs' right under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures by virtue of the same conduct. Similarly, the Court reads count 18 as plaintiff Abbott, individually, asserting that Miller violated her constitutional protection against invasion of privacy as safeguarded by Title III by intentionally intercepting telephone communications made by her on 3868.

The parties do not dispute that the Plaintiffs' allegations are based upon constitutional rights. Title III reflects Congress's attempt to codify the constitutional standards established by the Supreme Court in *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) with respect to electronic surveillance. *Mitchell v. Forsyth,* 472 U.S. 511, 530, 532, 105 S.Ct. 2806, 2818, 86 L.Ed.2d 411 (1985). Thus, counts 9, 11 and 18 allege a constitutional violation under Title III. In addition, the Fourth amendment confers upon citizens a constitutional right to protection against unreasonable search and seizure, *Katz,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, which is further secured by the Fourteenth amendment. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Accordingly, Counts 9, 11, and 18 are predicated upon recognized constitutional rights.

## B. *Clearly Established*

The second part of the district court's analysis focusses on whether the Plaintiffs have proven that it was "clearly established" *at the time of the wiretapping* that Miller's conduct constituted a constitutional violation. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. In other words, in order to find that he is entitled to qualified immunity, the Court must determine that, at the time of the wiretapping, Miller would not have been on notice that his behavior was "probably unlawful." *Montville v. Lewis,* 87 F.3d 900, 902–03 (7th Cir.1996) (quoting *Sherman v. Four County Counseling Center,* 987 F.2d 397, 401 (7th Cir.1993)). Miller began recording communications made on 3868 in September or early October of 1992 and discontinued this practice in May of 1993. (*See* 12(M) ¶ 10, Complaint ¶ 12). Accordingly, only legal developments up to and including this time period will be considered in determining the applicable state of the law.

1996), in which the court summarily held that defendants have the burden of establishing the defense of qualified immunity at trial. *Id.* at 123. Because this holding conflicts with the law of the

Seventh Circuit, and is without rationale, the Court finds that the Plaintiffs' argument is untenable.

In order to determine the applicable state of the law, a court should first look to binding precedent. *Cf. Donovan v. City of Milwaukee,* 17 F.3d 944, 952 (7th Cir.1994) (citations omitted) (emphasis added) ("*In the absence of controlling authority on point,* 'we seek to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.' "). Binding precedent is not, however, "a *sine qua non* of a finding that a particular right has been clearly established within the meaning of *Harlow.*" *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 431 (7th Cir.1989), *cert. denied,* 498 U.S. 949, 111 S.Ct. 368, 112 L.Ed.2d 331 (1990) (citations omitted). Where there is no controlling precedent, a court should examine all relevant caselaw in order to determine "whether at the time of the alleged acts a sufficient consensus had been reached indicating that the official's conduct was unlawful." *Id.; see also Doe v. Bobbitt,* 881 F.2d 510, 511 (7th Cir.1989) ("In the absence of a binding precedent, we will look to all relevant decisional law to determine whether a right has been clearly established."), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990). Put another way, in order to find that a right was clearly established in the absence of controlling precedent, the relevant caselaw should indicate that "recognition of the right by a controlling precedent was merely a question of time." *Cleveland–Perdue,* 881 F.2d at 431. Furthermore, while the constitutional right must be "sufficiently particularized" to put officials on notice of unlawful conduct, *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986), "cases involving the exact fact pattern at bar are unnecessary." *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Bakalis v. Golembe-ski,* 35 F.3d 318, 323 (7th Cir.1994) (quoting *Rakovich,* 850 F.2d at 1211) ("[T]he right should not be defined so intricately that invariably guiding law never can be found.").

### 1. Counts 9 & 18: Omnibus Crime Control and Safe Streets Act (Title III)

The plain language of the Omnibus Crime Control and Safe Streets Act (Title III) establishes a right to civil damages and other relief against "any employee, or agent of the United States or any State or political subdivision thereof, and any individual" "who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. §§ 2510(6), 2511(1)(a) (amended 1986), & 2520. "Intercept" is defined under the statute as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (amended 1986). The question before the court is whether a reasonable police official could reasonably conclude from applicable legal precedent that he was not violating a constitutional right to privacy by recording, but not listening to, the private communications of persons who were previously instructed in writing that such communications would not be recorded.

At the time of the wiretapping, several circuits had considered whether the term "intercept" implied only the actual listening to or hearing of private communications or whether it included the singular act of recording such communications. The Seventh Circuit has yet to determine this specific issue. However, this Court's review of relevant caselaw [6] reveals an apparent consensus that the term "intercept" includes recordation without hearing or listening. *See, e.g., United States v. Nelson,* 837 F.2d 1519, 1527

---

**6.** In support of their position, the Plaintiffs rely heavily upon *Amati v. City of Woodstock,* 829 F.Supp. 998 (N.D.Ill.1993), which clearly held that "[w]hether the communication is heard by the human ear is irrelevant" under circumstances virtually identical to the case at bar. *Id.* at 1008. Miller argues that *Amati* is not persuasive because the court did not reach the issue of whether a recording which is destroyed before it is ever heard by the human ear qualifies as an interception within the contemplation of the statute. However, because *Amati* was decided after the relevant time period, it cannot be considered as relevant caselaw for the purpose of determining whether the Plaintiffs' constitutional right was clearly established at the time of the alleged violation. Thus, the Court need not address either party's arguments in this regard.

(11th Cir.) ("[T]he term 'intercept' as it relates to 'aural acquisitions' refers to the place where a communication is initially obtained regardless of where the communication is ultimately heard."), *cert. denied,* 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988); *United States v. Turk,* 526 F.2d 654, 659 (5th Cir.1976) ("[W]e conclude that no new and distinct interception occurs when the contents of a communication are revealed through the replaying of a previous recording."), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *United States v. Shields,* 675 F.2d 1152, 1156 (11th Cir.1982) (citing *Turk,* 526 F.2d at 659) (interpreting the meaning of "interception" as occurring at the time of the recording, not when persons listened to the tape); *see also United States v. Rodriguez,* 968 F.2d 130, 144 (2d Cir.1992) (concurring, Meskill, J.,) ('Aural' was originally included in section 2510(4) principally to place devices such as pen registers and trap and tracing mechanisms (which do not capture the sounds of a conversation) outside the scope of Title III.... That some courts interpreted "aural" to mean that the territorial jurisdiction requirement of section 2518(3) applied to the place where the communications were first heard was at most an unintended artifact of the structure of the statute.), *cert. denied, Garcia v. United States,* 506 U.S. 847 113 S.Ct. 139, 121 L.Ed.2d 92 (1992). Furthermore, courts should strictly construe the provisions of Title III in order to carry out the congressional objectives undergirding the Act and ensure that privacy of the individual is protected. *United States v. Brodson,* 528 F.2d 214, 216 (7th Cir.1975); *see also United States v. Jones,* 542 F.2d 661, 671 (6th Cir.1976); *United States v. Sellaro,* 514 F.2d 114, 122–23 (8th Cir.1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *cf. United States v. King,* 478 F.2d 494, 505 (9th Cir.1973); *Jandak v. Village of Brookfield,* 520 F.Supp. 815, 820 (N.D.Ill.1981).

Miller argues that the law regarding the routine recording of telephone lines at police stations and, more specifically, the law concerning the recording of communications where no listening occurs was uncertain at the time of the alleged violation. In addition, Miller contends that *Nelson* does not clearly establish Plaintiffs' alleged constitutional rights because the court did not reach the issue of whether a recording which is destroyed before it is ever heard by the human ear qualifies as an interception within the contemplation of the statute. Miller maintains that such a recording does not qualify as an interception. In support of his position, Miller quotes *United States v. Bynum,* 360 F.Supp. 400, 408–09 (S.D.N.Y.1973), in which the district court for the southern district of New York held that "recording a communication which has not been heard by government agents and storing that recording so that it will not be heard, unless demanded by the parties involved in the conversation, does not constitute interception under the terms of the Act." *Id.* 360 F.2d at 408–09. In *Bynum,* the issue before the court involved the minimization of interception of communications not properly subject of interception. *Id.* at 408–10. While this Court, is inclined to hold that the recordation of private communications qualifies as interception in light of the chilling effect that such recordation has on private communication, *Amati,* 829 F.Supp. at 1008, and the policy interests in protecting individual privacy, it does not need to reach this issue as Miller has failed to meet his burden of establishing that there is no genuine issue of fact as to whether the recordings were ever heard or listened to by him or by another at his direction. *(See infra).*

Moreover, even under the standards set forth in *Bynum,* Miller has failed to show that the recordings were stored so that they would not be heard unless demanded by a party to the communication. Miller's testimony that the recordings were destroyed every thirty (30) days is not the same as storing communications in a manner such that their privacy would not be compromised. Indeed, the thirty-day recycling process allowed the defendant Miller thirty days too many to listen to the Plaintiffs' private communications. Accordingly, this Court finds that *Bynum* does not apply to the case at bar.

Second, Miller directs the court's attention to *Dunn v. Blue Ridge Telephone Co., 868* F.2d 1578 (11th Cir.*1989); Watkins v. L.M.*

*Berry & Co.,* 704 F.2d 577, 586 (11th Cir. 1983); and *Perfit v. Perfit,* 693 F.Supp. 851, 856 (C.D.Cal.1988) as evidence that, at the time of the wiretapping, relevant caselaw held that interception requires the listening to or hearing of private communications.[7] This Court's review of these cases, however, does not cause it to find that the law at the time of the alleged violation was not clearly established.

In *Watkins,* the court determined the point at which consensual, contemporaneous monitoring of employee telephone communications should cease during personal communications. *Watkins,* 704 F.2d at 584. There the court held that "[i]t is not necessary to the recovery of damages that the violator hear anything in particular; she need do *no more than listen.*" *Id.* (emphasis added). However, in stating that a violator "need do no more than listen," the *Watkins* court did not establish the minimum degree of intrusion necessary to qualify as interception. Rather, *Watkins* merely instructs potential defendants that the content of the intercepted private communication is irrelevant when the act of listening or hearing occurs. *Perfit* is similarly inapplicable because it involved one spouse's attempt to record another spouse's telephonic communications made in the marital home. *See Perfit,* 693 F.Supp. at 852, 856. There the court held that there was no interception even though a recording device was installed on the plaintiff spouses's line but notably failed to articulate its interpretation of the term "intercept." *See Perfit,* 693 F.Supp. at 852, 856.

*Dunn* offers the most support for Miller's argument. In *Dunn,* the plaintiff's line was tapped for 575 days. *Dunn* 868 F.2d at 1582 n. 16. The evidence supported a finding that the defendant listened to four communications, each occurring on four separate days. *Id.* at 1582. Under Section 2520 of the Act,

plaintiffs are entitled to "actual damages but not less than the liquidated computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher."[8] 18. U.S.C. § 2520. The court interpreted this provision to mean that a successful plaintiff is entitled to actual or liquidated damages for each communication that is intercepted within the meaning of the Act, and thus, set aside a jury award of $57,500 in liquidated damages which appeared to be based on the entire period of wiretapping. *Dunn,* 868 F.2d at 1582. Instead, the court diminished the plaintiff's recovery to $1,000—the larger sum between $400 ($100 for each communication listened to or heard) and $1,000. *Id.* In reaching this decision, the court apparently interpreted the term "intercept" to involve some action in addition to mere wiretapping or else it would not have set aside the jury award. Miller is, thus, correct in citing this case in support of his proposition. However, one aberrational case holding cannot disprove a showing that a consensus existed at the time of the wiretapping which clearly established Plaintiffs' constitutional right. *Cf. Warlick v. Cross,* 969 F.2d 303, 309 (7th Cir.1992) (one court's decision recognizing the alleged right is insufficient to fulfill plaintiff's burden of proving that law was clearly established particularly when another court has disagreed). Here the overwhelming majority of cases supported the Plaintiffs interpretation of the term intercept at the time of the wiretapping. None of the cases proffered by Miller challenge the evidence that, at the time of the wiretapping, there was a consensus among the courts that to rise to the level of interception the defendant need only have recorded a private communication.

Finally, Miller contends that the plain language of the Act supports his interpretation of the term "intercept." In section 2518(8)(a) of the Act, Congress makes the following

---

7. It should be made clear that Miller is not required to prove the antithesis of the Plaintiffs' burden as he unsuccessfully attempts to do here. The Court recognizes that it is Plaintiffs' burden to prove that, at the time of the wiretapping, such conduct was clearly prohibited by law. Conversely, Miller need not prove that the law explicitly sanctioned his acts. Nonetheless, the Court is obliged to address Miller's argument to the extent that he attempts to establish this as

counterevidence that the law was clearly established.

8. In 1986, this provision was amended to substitute the sum of $10,000 for $1,000. *See* 18 U.S.C. § 2520(c)(2)(B) (Supp. IV 1986). This amendment did not apply in *Dunn* because the interceptions preceded the amendment.

distinction between "interception" and "recording":

> The contents of any wire or oral communication *intercepted* by any means under this chapter shall, if possible, be *recorded* on tape or wire or other comparable device.

*Id.* Miller urges the Court to find that this distinction is evidence of Congress's intent to keep the recording of unheard communications from within the purview of the statute. This interpretation of Section 2518(8)(a) is also articulated in *Bynum. Id.* at 408–09. However, the only congressional intent that can be reasonably inferred from this provision is that Congress contemplated interception to include the listening to or hearing of private communications. It does not follow, however, that interception is limited to such actions. Furthermore, this Court finds that additional statutory interpretation reveals that Congress's inferred intent lends support to the Plaintiffs' construction of the term "intercept."

For instance, in *Flaherty v. Arkansas*, 415 U.S. 995, 94 S.Ct. 1599, 39 L.Ed.2d 893 (1974), the Court denied a petition for writ of certiorari by memorandum decision in which Justice Douglas dissented, joined by Justices Brennan and Marshall in a case involving Title III. In the dissent, Justice Douglas analyzed Title III in the following manner:

> That an "interception" can occur without overhearing a conversation being carried between two other persons is made clear by § 2511(2)(c) of Title III. This section comprehends that a party to a communication can 'intercept' it within the meaning of the statute; it provides, however, that such interception is not unlawful within the meaning of Title III:
>
> > "It shall not be unlawful under this chapter for a person acting under color of law to *intercept* a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

*Id.* at 995, 94 S.Ct. at 1600 (dissenting opinion) (citations omitted) (emphasis added). Thus, under this interpretation of the statute, interception does not require the listening to or hearing of a private communication.

In addition, the term "aural" as it is used in other provisions of Title III lends itself to the aforementioned interpretation. In Section 2510 "wire communication" is defined, in part, as "any *aural* transfer made in whole or in part through the use of facilities for the transmission of communications." 18 U.S.C. § 2510(1). "Aural transfer" is defined as "a transfer containing the human voice at any point between and including the point of origin and the point of reception." 18 U.S.C. § 2510(18). Similarly, it is plausible that Congress intended "aural acquisition" to mean an acquisition containing the human voice at any point between and including the point of reception, which would support the Plaintiffs' construction of the term "intercept." Thus, on balance, Miller's argument that the distinction between the terms "interception" and "recording" made in Section 2518 is indicative of Congress's intent to define interception as requiring the listening to or hearing of the subject communication is not self-evident and, moreover, is controverted by other provisions of the statute. Thus, the Court resolves that, at the time of the wiretapping, the law was clearly established that Miller's conduct of recording the Plaintiffs private communications made on 3638 amounted to a constitutional violation.

■ Furthermore, it is uncontested by both parties that the actual listening to and hearing of private communications constitutes "interception" within the contemplation of the Act. Accordingly, summary judgment is inappropriate under the circumstances at bar where there is a genuine issue as to whether Miller listened to or heard, endeavored to listen to or hear, or procured another to listen to or hear the Plaintiffs' private communications made on 3638. There is ample testimonial evidence from which a reasonable jury could conclude that Miller listened to the Plaintiffs' private communications. For example, James R. Greene, III, a police officer and member of the plaintiff class, testified in his deposition, "I would periodically be called into Chief Miller's office and he would basically word for word, you know, tell me things I had discussed with other people [on 3638]." (Deposition of James R.

Greene, III ("Greene Depo") p. 49–50).[9] In addition, Miller's justifications for tapping 3638 would necessarily require him to listen to the private communications of the Plaintiffs if he were to meet his stated objectives. For example, Miller has testified that the wiretapping was motivated, in part, by his desire to curb long distance telephone calls. (12(N) ¶ 13, 18; Miller Depo. pp. 79, 142–44). Thus, in order to identify those persons placing long distance telephone calls, Miller would necessarily have to listen or procure another to listen to the recorded communications. In addition, there is uncontradicted evidence that Ortiz was instructed to and did, in fact, listen to the private communications of Abbott and other plaintiffs made on 3638. (*See* 12(N) ¶ 21; Miller Depo. p. 134; Ortiz Depo. p. 85, 108).[10] From these facts, a reasonable jury could conclude that Miller did in fact listen to, endeavor to listen to, or procure another to listen to the private communications of the Plaintiffs made on 3638. Finally, there is ample evidence that Miller either listened to, endeavored to listen to, or procured another to listen to the private communications of the named plaintiff, Jodie Abbott. (Ortiz Depo. pp. 98, 108, 143–48, 151–52).

Moreover, a reasonable jury could properly conclude that, in searching for Abbott's conversations, Ortiz inevitably heard portions of other Plaintiffs' communications. *See In re State Police Litigation*, 88 F.3d 111, 125–26 (2d Cir.1996). That the individual Plaintiffs are unable to prove that specific communications were listened to is immaterial where there is sufficient evidence to show that a statutory violation occurred with respect at least one communication, that is, Abbott's, *see id.* at 125, and where denying the claim on this basis would unjustly reward the defendant Miller for his clandestine maneuvers. In light of the foregoing, the Court denies Miller's motion for summary judg-

ment on Counts 9 and 18. This ruling is not immediately appealable since summary judgment was denied, in part, on the ground that there is a genuine issue as to a material fact. *Johnson v. Jones*, ⸺ U.S. ⸺, ⸺ 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (quoting *Mitchell*, 472 U.S. at 530 n. 10, 105 S.Ct. at 2817 n. 10) (A denial of summary judgment on grounds of no qualified immunity is subject to interlocutory appeal only if predicated upon " 'a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.' "); *see also In re State Police Litigation*, 88 F.3d at 124–25.

### 2. Count 11: Violation of the Fourth and Fourteenth Amendments under § 1983

■ In Count 11 of their complaint, the Plaintiffs allege violations of the Fourth and Fourteenth Amendments which give rise to a § 1983 cause of action. The Fourth Amendment strictly prohibits searches performed without judicial authorization where there is a legitimate expectation of privacy unless specific exceptions exists, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), none of which are applicable here. In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court instructed that a law enforcement officer who participates in a search that violates the Fourth Amendment cannot be held personally liable for money damages if his actions demonstrated "objective legal reasonableness" in light of "clearly established" law. *Id.* at 639, 107 S.Ct. at 3038. This means that preexisting law must make it "apparent" that the conduct is unlawful. *Id.* at 640, 107 S.Ct. at 3039.

■ Miller argues that the relevant law at the time of the wiretapping did not address "in a particularized sense" the lawfulness of the conduct at issue. Miller con-

---

9. In addition, the Plaintiffs refer to the testimony of Robert L. Commons. (Plaintiffs Memo. p. 8). However, from what the Court could decipher from this poorly excerpted passage, the only evidence of Miller's having overheard conversations is inadmissible as hearsay. (*See* Deposition of Robert L. Commons ("Commons Depo.") p. 166).

10. The Plaintiffs also offered the testimony of James Greene to prove that Miller instructed Ortiz to transcribe the recorded communications of Abbott. (12(N) ¶ 27). However, such evidence is inadmissible as hearsay and therefore cannot be considered in a motion for summary judgment. (*See* Greene Depo. pp. 165–68).

strues the relevant conduct as a "potential" but not "actual" invasion of privacy since, by his account, the recorded communications were never heard or listened to. Miller further posits that under *U.S. v. Karo*, 468 U.S. 705, 712, 104 S.Ct. 3296, 3301, 82 L.Ed.2d 530, *reh'g denied*, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984), a mere "potential" invasion of privacy does not rise to the level of unconstitutionality. *Id.* at 712, 104 S.Ct. at 3301. Thus, according to Miller, at the time of the wiretapping it was not clearly established that the mere recording the Plaintiffs' private communications would violate the Fourth Amendment since in order for invasion of privacy to occur in this context there must be a listening to or hearing of the private communication. Ignoring the circularity of Miller's argument, when the evidence is viewed in the light favorable to the Plaintiffs, it clearly supports a finding by a reasonable jury that Miller or someone under his direction listened to the subject communications.

At the time of the wiretapping, the law was clearly established that the listening to private communications by police officials without a warrant constituted an unconstitutional search under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Plaintiffs contend that, at the time of the wiretapping, the law was clearly established that unauthorized wiretapping constituted a violation of the Fourth Amendment.[11] In support of their argument, the Plaintiffs cite the following cases: *United States v. Sababu*, 891 F.2d 1308 (7th Cir.1989); *United States v. Feekes*, 879 F.2d 1562 (7th Cir.1989); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577 (11th Cir. 1983); *Jandak v. Village of Brookfield*, 520 F.Supp. 815 (N.D.Ill.1981); *People v. Satek*, 78 Ill.App.3d 543, 33 Ill.Dec. 409, 396 N.E.2d 1133 (1st Dist.1979).[12] Miller argues that these cases are inapposite to the case at bar

and therefore do not clearly establish the alleged violation in a "particularized sense." While *Anderson* states that preexisting law must establish the violation "in a more *particularized*, and hence, more *relevant* sense" it explains that an exact symmetry of fact patterns need not exist. *See Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Accordingly, this Court examines the preexisting law to determine its relevancy to the facts at bar and its likelihood to have put a reasonable police chief on notice that his conduct was unlawful under these particularized facts.

The facts before the court tell the story of a police chief who issued a memorandum which explicitly stated that 3868 would not recorded and then, without issuing contrary notice, surreptitiously recorded private communications conducted on that line. In *Sababu* and *Feekes*, this Circuit held that the wiretapping of telephone communications between prison inmates and unincarcerated persons did not violate the Fourth Amendment where a legitimate expectation of privacy could not be established in view of posted signs and published policies which stated that such calls were subject to monitoring and plaintiff's use of code language which indicated that she had no subjective expectation of privacy. *Sababu*, 891 F.2d at 1329; *Feekes*, 879 F.2d at 1565; *see also Jandak* 520 F.Supp. at 824–25 (holding that wiretapping of an officer's private communications made on a line of which he had notice was subject to routine recording did not violate Title III). Conversely, it follows under *Katz* that where there is a legitimate expectation of privacy, as was created by Miller's memorandum, unauthorized wiretapping is prohibited under the Fourth Amendment. *Id.* at 352, (concurring, Harlan J.) 361–62, 88 S.Ct. at 511–12, 516–17. Similarly, in *Watkins*, the Eleventh Circuit held that employers who monitor telephone communications for quality control

---

**11.** The Plaintiffs also argue that the unauthorized wiretapping of private communications violates the Fourth Amendment regardless of whether the defendant listened to heard the subject communications. The Court need not reach this issue, however, since it has decided that preexisting law "clearly established" that the unauthorized listening to and hearing of private communications constitutes a Fourth Amendment violation

and there is a genuine issue of material fact as whether such a violation occurred.

**12.** In addition, the Plaintiffs cite *In re State Police Litigation*, 888 F.Supp. 1235, 1266 (D.Conn. 1995) and *Sheinbrot v. Pfeffer*, 1995 WL 432608 (E.D.N.Y.1995). However, these cases are inapplicable since they were decided after the alleged violation.

are not permitted to monitor non-work related communications without the consent of the employee. *Id.* at 581–82 (Title III).

Miller attempts to distinguish these cases by noting that they involve either the specific, targeted recordation of prisoner communications or the contemporaneous monitoring of calls by private employers. These distinctions do not render these cases irrelevant to the case at bar. Indeed, each case clearly establishes that it is a violation to wiretap or otherwise monitor the private communications of another without authorization, notice, or consent. It was, thus, "apparent" within the contemplation of the touchstone of *Anderson* that, if proven, Miller's conduct of recording and listening to or hearing the Plaintiffs' private communications was unlawful. The defendant Miller's motion for summary judgment on Count 11 is thus denied because a genuine issue of material fact exists as to whether an "actual" invasion of privacy occurred.

## II. Illinois Tort Immunity Act: Counts 13 & 15

 In Counts 13 & 15 of their complaint, the Plaintiffs seek civil and punitive damages against the defendant Miller for his alleged violation of their right of privacy under the Illinois common law and applicable provisions of the Illinois Eavesdropping Act, 38 Ill.Rev.Stat. Sec. 14–6. Miller responds that he is protected under the Illinois Tort Immunity Act (the "Act") from liability arising out of claims brought under either the common or statutory laws of Illinois. The Illinois Tort Immunity Act § 2–201 reads in part

> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

Ill.Rev.Stat. ch. 85, § 2–201 (now at 745 ILCS 10/2–201). State law governs the application of this statute. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1297 (7th Cir.1992).

In *Kennell v. Clayton Township*, 239 Ill. App.3d 634, 179 Ill.Dec. 980, 606 N.E.2d 812 (1992), the Illinois Court of Appeals distinguished between discretionary and ministerial acts as follows:

> Discretionary acts are those which are unique to the particular public office and involve the exercise of judgment. On the other hand, ministerial acts are those which are performed in a prescribed manner, in obedience to the mandate of legal authority, without regard to the exercise of discretion as to the propriety of the acts being done.

*Id.* at 639, 179 Ill.Dec. at 984, 606 N.E.2d at 816 (citations omitted). Whether an act is discretionary or ministerial is determined on a case-by-case basis. *Johnson v. Mers*, 279 Ill.App.3d 372, 379, 216 Ill.Dec. 31, 37, 664 N.E.2d 668, 674 (1996). Miller maintains that his act of recording 3868 was discretionary. This Court agrees. Miller's act of recording 3638 after it was specifically designated as an unrecorded line was a result of Miller's "personal deliberation, decision and judgment" and thus, not a ministerial act. *Bonnell v. Regional Bd. of Sch. Trustees*, 258 Ill.App.3d 485, 489, 196 Ill.Dec. 612, 630 N.E.2d 547 (5th Dist.1994); *accord Amati v. City of Woodstock*, 1996 WL 328351 *4 (N.D.Ill.1996) (unpublished opinion). Although Miller sought the advice of counsel at or around the time he caused the recording device to be installed on 3868, it is apparent from the informal and nonobligatory nature of the conversation and Miller's refusal to follow such advice that Miller's conduct was not "prescribed" or "without regard to the exercise of discretion as to the propriety" of his actions. *See Kennell*, at 639, 179 Ill.Dec. at 984, 606 N.E.2d at 816. The evidence shows that Miller called Smith and asked whether it was necessary that there be an audible beep on 3868 in order for that line to be recorded. (12(M) ¶ 1; Miller Depo. p. 65). Notably, Miller did not call Perry to seek permission to record 3868. Rather, both Miller's and Smith's testimony reveal that Miller had already decided and installed apparatus to enable him to record communications made on 3868. (*Id.* at 65, Smith Depo. pp. 16–17). Miller was merely uncertain about

whether there should be an audible beep. (Miller Depo. at 65, Smith Depo. pp. 16–17). According to Miller, Smith responded that anyone calling the police department should assume that calls were being taped. (*Id.* at 66). Smith, on the other hand, maintains that he specifically informed Miller "that the law requires that [users of 3868] have notice that they are being recorded and that [Miller had] to put the beep tone on the line." (Smith Depo. p. 20).[13] A jury could reasonably conclude from Smith's testimony that Miller's decision to record 3868 was not ministerial since it was indirect contradiction with Smith's advice. The Illinois Tort Immunity Act thus applies unless an exception to the Act exists.

In *Barth by Barth v. Board of Educ. of the City of Chicago*, 141 Ill.App.3d 266, 95 Ill. Dec. 604, 490 N.E.2d 77 (1986), the court stated that immunity "does not extend to (1) a public employee's acts based on corrupt or malicious motives, or (2) a public employee's willful and wanton acts." *Id.*, 141 Ill.App.3d at 273, 95 Ill.Dec. at 608, 490 N.E.2d at 81. Allegations of intentional conduct are sufficient to plead willful and wanton conduct for the purposes of the act. *Carter v. Dixon*, 718 F.Supp. 1389, 1390 (N.D.Ill.1989). Although the Plaintiffs do not specifically use the terms "willful and wanton" in their complaint, the Court finds that their allegations are sufficient to create a genuine issue of material fact as to whether an exception under the Act exists. For instance, in paragraph 20 of their complaint, the Plaintiffs specifically allege that the defendant Miller "caused to be installed an electronic or mechanical device that *surreptitiously* intercepted all telephone communications made over [3868]." (Complaint ¶ 9 (emphasis added); *see also* ¶ 20). In addition, in paragraphs 170 and 272 the Plaintiffs further allege that "Miller *intentionally* intercepted telephone communications made by plaintiffs on [3868]" and "*intentionally* used an eavesdropping device to record and/or hear telephone communications made by the plaintiffs on [3868]." (*Id.* at ¶¶ 170, 272 (emphasis added)). In addition, the Plaintiffs have demonstrated that they have evidence to meet their burden of proof in this issue at trial. Moreover, a reasonable jury might conclude that Miller's actual use of the recorded conversations—listening to the conversations of certain individuals—and alleged disregard of the village attorney's advice suggest a malicious motive. Thus, the Court finds that for the purposes of the Act, the Plaintiffs have sufficiently alleged "willful and wanton" conduct on the part of the defendant Miller. Accordingly, the Miller's motion for summary judgment on counts 13 & 15 is denied.

### III. Implied Consent

■ Miller claims that certain Plaintiffs knew or suspected that 3868 was being recorded and thus impliedly consented to the recordation of their communications by continuing to use 3868 after acquiring such knowledge or suspicion. (12(M) ¶¶; Def. Reply Memo. p. 7; Abbott Depo. pp. 9, 11, 21; G. Wollert Depo. pp. 18–19, 32–33, 44–45; T. Wollert Depo. pp. 27–28; Ortiz Depo. pp. 130–31). The Plaintiffs dispute that beep tones were heard and maintain that consent cannot be implied under the circumstances. (12(N) ¶ 3, 10; Ortiz p. 95; Greene p. 80).

The Seventh Circuit has spoken on the issue of implied consent in this context and resolved as follows:

> Consent under title III is not to be cavalierly implied. Title III expresses a strong purpose to protect individual privacy by strictly limiting the occasions on which interception may lawfully take place. *See United States v. Harpel*, 493 F.2d 346, 351 (10th Cir.1974). Stiff penalties are provided for its violation. It would thwart this policy if consent could routinely be implied from circumstances. *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 820 (N.D.Ill. 1981). Thus, knowledge of the capability of monitoring alone cannot be considered implied consent. *See Campiti v. Walonis*, 611 F.2d 387, 394 (1st Cir.1979); *Crooker v. United States Department of Justice*, 497 F.Supp. 500, 503 (D.Conn.1980) (prisoners' knowledge that calls were routinely

---

**13.** Miller did not inform Smith that Miller had previously issued a memorandum which affirmatively stated that 3868 would not be recorded. (Miller Depo. at 66).

monitored did not constitute consent to it). The cases that have implied consent from circumstances have involved far more compelling facts than those presented here. In *Jandak*, the police officer whose call was intercepted knew or should have known that the line he was using was constantly taped for police purposes; furthermore, an unmonitored line was provided expressly for personal use. 520 F.Supp. at 824–25. In *Simmons v. Southwestern Bell Telephone Co.*, 452 F.Supp. 392, 393–94 (W.D.Okl.1978), *aff'd*, 611 F.2d 342 (10th Cir.1979), the plaintiff made a personal call on telephones which were to be used exclusively for business calls and which he knew were regularly monitored. He had been warned on previous occasions to stop making personal calls from his business telephone; other telephones were specifically provided for personal use. As in *Jandak*, the [*Simmons* ] court held that the employee was fully aware of the extent of the monitoring and deliberately ignored the strong probability (certainty in *Jandak* ) of monitoring. 452 F.Supp. at 396. *Watkins*, 704 F.2d at 581–82 (footnotes omitted).

Unlike the circumstances in *Jandak* and *Simmons* where the plaintiffs were using lines specifically designated for business purposes, here the Plaintiffs were instructed by written memorandum that 3868 would be maintained as a private, unrecorded line for personal use by the Plaintiffs. Whether the plaintiffs heard beep tones when using 3868 is insufficient to nullify the effect of the memorandum. Moreover, there is a genuine issue regarding whether and when the Plaintiff gained sufficient knowledge or suspicion that the lines were being recorded so that their consent could be implied. Thus, their continued use of 3868 does not amount to consent as it is cautiously implied in this context. *See id.* at 582. Accordingly, Miller's motion for summary judgment on counts 9, 11, 13, 15, and 18 on the ground that there was implied consent is denied.

### *Conclusion*

WHEREFORE, for the reasons stated in this memorandum opinion, the defendant Miller motion for summary judgment on counts 9, 11, 13, 15, and 18 is hereby DENIED.